COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Clements and Senior Judge Overton
Argued at Chesapeake, Virginia


MICHAEL HELMICK

                                          MEMORANDUM OPINION* BY
v.        Record No. 0454-03-1              JUDGE JEAN HARRISON CLEMENTS
                                              FEBRUARY 15, 2005
MELISSA SPRONG, RAYMOND HELMICK
 AND BETTY HELMICK


            FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
                        Verbena M. Askew, Judge

            Oldric J. LaBell, Jr., for appellant.

            Breckenridge Ingles (McClanahan Ingles; Martin, Ingles & Ingles,
            Ltd., on brief), for appellee Melissa Sprong.

            No brief or argument for appellees Raymond Helmick and Betty
            Helmick.


        Michael Helmick (father) appeals from the January 29, 2003 order of the circuit court,

awarding visitation with his minor son (child) to Raymond and Betty Helmick (great-grandparents)

and granting the motion of Melissa Sprong (mother) to deny him access to child's medical records.

Father contends the circuit court erred in (1) prohibiting great-grandparents from taking child to

visit him in prison and (2) denying him access to child's medical records.  For the reasons that

follow, we affirm the decision of the circuit court.

        As the parties are fully conversant with the record in this case, and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

_____

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

## I. BACKGROUND

On appeal, we consider the evidence in the light most favorable to the party prevailing below. Wilson v. Wilson, 12 Va. App. 1251, 1254, 408 S.E.2d 576, 578 (1991). So viewed, the evidence proved that great-grandparents raised father as a son since his birth. Mother and father were married in November 1997. Mother gave birth to child in January 1998. For nearly two years following the birth, great-grandparents helped care for child. They often kept child overnight when mother and father worked late at night. Mother and father separated in December 1999, when father was first incarcerated on felony charges. During that initial incarceration, mother took child to visit father in jail one time. Father was subsequently released on bond pending trial.

On May 3, 2000, the circuit court entered a *pendente lite* decree in the divorce case, granting father specific visitation with child. Father exercised such visitation with child at great-grandparents' house until June 2000, at which time he was sentenced to thirty years in prison with twenty-two years suspended. Mother continued to allow child to regularly visit great-grandparents. During those visits, child talked to father on the telephone and great-grandparents read him letters father had sent him. During child's visit with great-grandparents on September 14, 2000, the police transported father to meet child at the Hampton Coliseum in exchange for father's cooperation in other cases. Mother learned of the meeting only after it took place.

The circuit court entered a final decree of divorce on April 30, 2001, awarding mother custody of child, granting father "reasonable visitation," and transferring the matter to the juvenile and domestic relations district court (J&DR court). Following entry of the final decree, mother continued to permit child to visit great-grandparents.

During the summer of 2001, great-grandparents asked mother for permission to take child to visit father in prison. Mother forbade them from doing so. In response, great-grandparents filed a petition dated October 25, 2001, in the J&DR court requesting court-ordered visitation so they could take child to see father in prison. Great-grandparents' petition stated that child's "visitation requires determination." Mother requested that father's visitation be terminated, that father be denied child's medical records, and that father's letters to child be screened.

After conducting a hearing on the parties' respective motions, the J&DR court denied mother's motions and granted great-grandparents visitation with child on every other Wednesday from 9:00 a.m. to 6:30 p.m. and on the last Friday of each month from 6:30 p.m. to 7:00 p.m. the next day. The court memorialized its decisions in an April 15, 2002 order entered *nunc pro tunc* March 18, 2002. The court's order did not expressly address whether great-grandparents could take child to visit father in prison; however, no conditions or restrictions were placed on the ordered visitation. On April 15, 2002, mother noted her appeal of the J&DR court's decision.

After the J&DR court hearing, great-grandparents took child to see father at Mecklenburg Correctional Center. Later in the summer, following father's transfer, great-grandparents took child to see father at Greensville Correctional Center. Great-grandparents took child to see father in prison approximately six times.

Observing that child was more defiant and experienced nightmares and bed wetting upon his return from visiting father in prison, mother took child, on April 16, 2002, April 29, 2002, and August 26, 2002, to see Dr. Howard Bierenbaum, a clinical psychologist who had previously evaluated and treated child for behavioral problems experienced after mother and father's separation and divorce. Mother also contacted the authorities at Greensville Correctional Facility to request that child not be permitted to see father in prison without a court order directly authorizing such visitation.

In November 2002, great-grandparents received a letter from the assistant warden of Greensville Correctional Center informing them that they would need a court order expressly authorizing child's visitation with father before child could reenter the facility.

The circuit court heard mother's *de novo* appeal of the J&DR court's decision on September 10 and November 12, 2002. At those hearings, mother did not oppose great-grandparents' request for visitation with child but asked that their visitation be amended to accommodate child's attendance in school and that great-grandparents not be allowed to take child during their visitation to see father in prison. Mother further asked that father be denied child's medical records. Great-grandparents did not oppose mother's request to amend their visitation to accommodate child's attendance at school but requested that they be specifically authorized to continue to take child to see father in prison and that they be granted additional weekend and holiday visitation with child. Father requested that he be given access to child's medical records and that great-grandparents be allowed to bring child to visit him in prison. Child's guardian *ad litem* requested that great-grandparents not be allowed to take child to visit father in prison.

After considering the evidence presented, including the *de bene esse* deposition of Dr. Bierenbaum, and argument of counsel, the circuit court awarded great-grandparents visitation with child on alternate Fridays from 1:30 p.m. to 10:00 a.m. the next day, the last Friday of each month from 6:00 p.m. to the next day at 6:00 p.m., and one day during each of the Easter, Thanksgiving, and Christmas holiday vacations. As memorialized in its order of January 29, 2003, the court further ruled as follows:

> 1. The Court finds that the non-custodial parent who is currently incarcerated in a state correctional facility is not entitled to the minor child's medical records and the Court finds pursuant to Virginia Code § 20-124.6 that good cause has been shown for denying the child's medical records to his father who is not in a position to make any decisions regarding the child's medical care or treatment.

- 4 -

2. The Court believes that it is not appropriate for this four year old child to visit his father in prison and after considering the criteria in Virginia Code § 20-124.3 finds that it is not in the child's best interest to have visits at the state correctional facility and consequently the Court **ORDERS** that the great-grandparents are prohibited from taking the minor child to see his father at Greensville or any other state correctional facilities during their visitation.

This appeal followed.

## II. VISITATION

On appeal, father contends the circuit court erred in ruling that great-grandparents were not allowed to bring child to visit him in prison. In support of that contention, father first argues that the circuit court failed to find that a material change in circumstances had occurred since entry of the final decree of divorce, which was necessary before the court could amend the "reasonable visitation" he had pursuant to that decree. The evidence, he maintains, shows that, "when the final decree of divorce was entered, . . . he was already incarcerated." Father also argues that the circuit court failed to consider "the strong and loving relationship" he had with child and child's preference, as required by subdivisions 3 and 8 of Code § 20-124.3. The circuit court's decision depriving him of in-person visitation with child at the prison, he maintains, is "contrary to the evidence when the strong ties between [father] and [child] are considered along with the fact that the visitation had been allowed for six months without any problems." Thus, father concludes, the circuit court improperly deprived him of in-person visitation with child. We hold that father's claim is without merit.

While father is correct generally that there can be no change in visitation unless there has been a material "change in circumstances" since the last visitation award, Albert v. Albert, 38 Va. App. 284, 293, 563 S.E.2d 389, 394 (2002), father's premise that the circuit court had to find that a change in circumstances had occurred before it could "amend" his visitation rights set forth in the final decree of divorce is flawed under the circumstances of this case because the circuit court

did not amend father's visitation rights. In order for the circuit court's refusal to allow great-grandparents to take child to see father in prison to constitute a change in father's visitation rights since entry of the divorce decree, the divorce decree must have given father the right to in-person visitation with child. However, with respect to visitation, the divorce decree stated solely that father was entitled to "reasonable visitation." The decree provided neither a definition of "reasonable visitation" nor any details as to what constituted "reasonable visitation." Certainly, we cannot say, as a matter of semantics, that "reasonable visitation" categorically involves in-person visitation, particularly if, as here, the person exercising the visitation is in prison.

Nor, despite father's apparent claim to the contrary, did the circumstances existing at the time of the divorce decree's entry establish that the "reasonable visitation" granted in the decree involved in-person visitation. Unlike the May 3, 2000 *pendente lite* decree, which was entered while father was out of jail on bond and able to exercise the specifically granted in-person visitation with child at great-grandparents' house, the final decree of divorce was entered after father had begun serving his sentence of at least eight years' incarceration. Other than a single visit arranged by the police that mother learned of only after it had occurred, father had no in-person visitation with child between his incarceration in June 2000 and the entry of the final decree on April 30, 2001. During that period and following the entry of the divorce decree, mother continued to allow child to regularly visit great-grandparents at their house, where child talked to father on the telephone and received letters from him, but never authorized in-person visitation by father. Accordingly, we cannot say that the circuit court's grant to father in the final decree of "reasonable visitation" constituted in-person visitation with child while father was in prison. This conclusion is buttressed by the fact that, in petitioning the J&DR court for visitation with child and for authorization to take child to see father in prison after mother had denied their request for

permission to do so, great-grandparents asked the court for a "determination" of child's visitation, rather than for a change in visitation.

It is clear, therefore, that the matter before the lower courts was not a request to amend father's visitation rights but a request to determine what visitation was "reasonable"—specifically, whether in-person visitation with child while father was in prison was "reasonable." Ultimately, the circuit court determined that it was not. Accordingly, we conclude that, in denying great-grandparents' request for authorization to take child to see father in prison and, thus, depriving father of in-person visitation with child while he was in prison, the circuit court did not amend father's right to the undefined "reasonable visitation" granted him in the final decree of divorce. Hence, the circuit court was not required to find that a material change in circumstances had occurred since the divorce decree was entered.

Additionally, we reject father's assertion that the circuit court failed, in determining the best interests of child for visitation, to consider the requisite factors set forth in subdivisions 3 and 8 of Code § 20-124.3.[1]

---

[1] Subdivisions 3 and 8 of Code § 20-124.3 provide as follows:

> In determining best interests of a child for purposes of determining custody or visitation arrangements . . . , the court shall consider the following:
>
> *     *     *     *     *     *     *
>
> 3. The relationship existing between each parent and each child, giving due consideration to the positive involvement with the child's life, the ability to accurately assess and meet the emotional, intellectual and physical needs of the child;
>
> *     *     *     *     *     *     *
>
> 8. The reasonable preference of the child, if the court deems the child to be of reasonable intelligence, understanding, age and experience to express such a preference; . . . .

"In matters of custody, visitation, and related child care issues, the court's paramount concern is always the best interests of the child." Farley v. Farley, 9 Va. App. 326, 327-28, 387 S.E.2d 794, 795 (1990).

> Code § 20-124.3 specifies the factors a court "shall consider" in determining the "best interests of a child for . . . custody or visitation." Although the trial court must examine all factors set out in Code § 20-124.3, "it is not 'required to quantify or elaborate exactly what weight or consideration it has given to each of the statutory factors.'"

Brown v. Brown, 30 Va. App. 532, 538, 518 S.E.2d 336, 338 (1999) (quoting Sargent v. Sargent, 20 Va. App. 694, 702, 460 S.E.2d 596, 599 (1995) (quoting Woolley v. Woolley, 3 Va. App. 337, 345, 349 S.E.2d 422, 426 (1986))). Hence, while "Code § 20-124.3 requires the trial court to identify the fundamental, predominating reason or reasons underlying its decision," the court is not required "to address all aspects of the decision making process, as one would expect from comprehensive findings of fact and conclusions of law." Lanzalotti v. Lanzalotti, 41 Va. App. 550, 554, 586 S.E.2d 881, 882 (2003). "As long as evidence in the record supports the trial court's ruling and the trial court has not abused its discretion, its ruling must be affirmed on appeal." Brown, 30 Va. App. at 538, 518 S.E.2d at 338.

Here, the record establishes that great-grandparents and father presented extensive evidence regarding father's existing relationship with child, including his involvement with child's life during the in-person visits at the prison and through phone calls and letters at other times. The record also establishes that, although the circuit court refused to interview child regarding his visitation preference, mother admitted that, if asked, child would say, like most four-year-old children, that he wanted to visit father at the prison. In rendering her ruling from the bench, the circuit court judge stated as follows:

> The Court doesn't think it's appropriate for visitation at a prison. It's very inappropriate for a child to visit – I think it's self evident with the testimony from the mother that it would not be in

- 8 -

> the child's best interest. To do that the Court looks at [Code
> § 20-124.3] and it finds that it is not in the best interest of the child to
> have him visit the father at the facility where he is now. If they come
> up with another arrangement, fine, visitation is okay, but not at the
> facility.

In the January 29, 2003 order, the circuit court specified that it reached its decision that it was not in child's best interests to visit father in prison only after "considering the criteria in . . . Code § 20-124.3." Conversely, nothing in the record proves father's assertion that the circuit court failed to consider the factors set forth in subdivisions 3 and 8 of Code § 20-124.3.

Thus, in light of the record's abundance of evidence regarding father's existing relationship with child, mother's admission regarding child's preference, and the circuit court's declarations that it considered the factors enumerated in Code § 20-124.3, we cannot say, as father would have us do, that the circuit court failed to consider father's existing relationship with child and child's preference. Having taken those factors into account, the circuit court determined nonetheless that it was not in child's best interests to visit father in prison.

Moreover, we cannot say that the circuit court abused its discretion in refusing to permit great-grandparents to take child to visit father in prison. Additionally, the evidence in the record amply supports the court's decision. Regarding child's visits with father in prison, mother testified that child "started having nightmares and . . . wetting the bed when he [came] back" from seeing father in prison. Mother further testified that, after being "totally toilet trained" when he was three years old, child "never had an accident at night" until after he started visiting father in prison. Mother added that "most of [child's nightmares] occur[ed]" when "he [came] home" after seeing father in prison. Concerned about child's nightmares and bed wetting, mother took child to see Dr. Bierenbaum on April 16, 2002, April 29, 2002, and August 26, 2002. Dr. Bierenbaum confirmed that mother reported to him that child, who was "typically . . . not a bed wetter," experienced bed wetting and nightmares following his visits with father in prison. Dr. Bierenbaum

- 9 -

further testified that, despite his having evaluated and treated child in the past, mother had never told him that child suffered from nightmares prior to the visits in April 2000. An expert in the field of child clinical psychology, Dr. Bierenbaum stated that bed wetting by a child who was toilet trained through the night, "just as with the nightmares, . . . would suggest that something frightening or upsetting or worrisome had occurred."

We conclude, therefore, that the circuit court did not err in denying great-grandparents' request for authorization to take child to visit father in prison.

### III. CHILD'S MEDICAL RECORDS

Father contends, on appeal, that the circuit court erred in granting mother's request to deny him access to child's medical records. In support of that contention, father argues that the circuit court's rationale for its decision directly conflicted with the terms of Code § 20-124.6 and that there was no evidence to support a finding that good cause existed under Code § 20-124.6 to deny him access to child's medical records.[2]

Upon reviewing the record, we conclude that father's argument that the circuit court's reasoning violated Code § 20-124.6 is procedurally barred under Rule 5A:18.

Rule 5A:18 provides, in pertinent part, that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless the objection was stated together with the grounds therefor at the time of the ruling."

> "Under Rule 5A:18 we do not notice the trial errors for which no timely objection was made except in extraordinary situations when necessary to enable us to attain the ends of justice. The laudatory purpose behind Rule 5A:18, and its equivalent Supreme Court Rule 5:25, frequently referred to as the contemporaneous objection rules, is to require that objections be promptly brought to the attention of the trial court with sufficient specificity that the

---

[2] Code § 20-124.6 provides, in pertinent part, that "neither parent, *regardless of whether such parent has custody*, shall be denied access to the academic, medical, hospital or other health records of that parent's minor child unless otherwise ordered by the court *for good cause shown*." (Emphases added.)

- 10 -

> alleged error can be dealt with and timely addressed and corrected when necessary. The rules promote orderly and efficient justice and are to be strictly enforced except where the error has resulted in manifest injustice. Errors can usually be corrected in the trial court, particularly in a bench trial, without the necessity of appeal."

Bazemore v. Commonwealth, 42 Va. App. 203, 218, 590 S.E.2d 602, 609 (2004) (en banc) (quoting Brown v. Commonwealth, 8 Va. App. 126, 131, 380 S.E.2d 8, 10 (1989)). Moreover, "[m]aking one specific argument on an issue does not preserve a separate legal point on the same issue for review." Edwards v. Commonwealth, 41 Va. App. 752, 760, 589 S.E.2d 444, 448 (2003) (en banc), aff'd, No. 040019 (Va. Sup. Ct. Order of 10/15/04). Hence, a specific objection and "argument must be made to the trial court at the appropriate time, or the allegation of error will not be considered on appeal." Id. "To hold otherwise, would invite parties to remain silent at trial, possibly resulting in the trial court committing needless error." Gardner v. Commonwealth, 3 Va. App. 418, 423, 350 S.E.2d 229, 232 (1986).

Here, as memorialized in the January 29, 2003 order, the circuit court granted mother's motion to deny father access to child's medical records, finding that "good cause [was] shown" pursuant to Code § 20-124.6 for denying such access because father was "not in a position to make any decisions regarding the child's medical care and treatment." In explaining the rationale for that ruling, the circuit court judge stated at the November 12, 2002 hearing that father was not entitled to child's medical records because he did not have joint custody of child. "[W]hen it's not joint custody," the judge explained, "the other party is not really entitled to the medical records because they won't be participating in making decisions with reference to the medical care that's provided to the child."

Despite having the opportunity to do so, father asserted no objection at the hearing to the court's stated reasoning. Likewise, father noted no objection to entry of the January 29, 2003 order. In other words, father remained silent and never brought to the circuit court's attention the error he

now asks us to redress on appeal. Thus, the circuit court never had the opportunity to consider, address, or correct its use of the erroneous standard. Moreover, our review of the record reveals no reason to invoke the "ends of justice" or "good cause" exceptions to Rule 5A:18. See Edwards, 41 Va. App. at 761, 589 S.E.2d at 448 ("We will not consider, *sua sponte*, a 'miscarriage of justice' argument under Rule 5A:18."); M. Morgan Cherry & Assocs. v. Cherry, 38 Va. App. 693, 702, 568 S.E.2d 391, 396 (2002) (en banc) (holding that the "good cause" exception to Rule 5A:18 will not be invoked where appellant had the opportunity to raise the issue at trial but did not do so). We hold, therefore, that father is barred by Rule 5A:18 from raising this particular claim of error for the first time on appeal.

Turning to father's argument that there was no evidence to support a finding that good cause existed under Code § 20-124.6 to deny him access to child's medical records, we note that the following principles are pertinent to the resolution of this issue:

> "'The trial court's decision, when based upon an *ore tenus* hearing, is entitled to great weight and will not be disturbed unless plainly wrong or without evidence to support it.' [Venable v. Venable, 2 Va. App. 178, 186, 342 S.E.2d 646, 651 (1986).] 'Certainly it is true that the legal rights of the parent should be respected . . . but the welfare of the child is to be regarded more highly than the technical legal rights of the parent.' [Forbes v. Haney, 204 Va. 712, 716, 133 S.E.2d 533, 536 (1963).]"

Green v. Richmond Dep't of Soc. Servs., 35 Va. App. 682, 686-87, 547 S.E.2d 548, 550 (2001) (quoting L.C.S. v. S.A.S., 19 Va. App. 709, 724, 453 S.E.2d 580, 588 (1995)).

Here, the evidence established that, following his incarceration, father requested copies of child's medical records from the Children's Clinic and from Dr. Bierenbaum. From the records he obtained from the Children's Clinic, father discovered only that mother "hadn't taken [child] to the doctor on a day that she told [great-grandparents] she had" and that child "had had a virus." He did not receive any records directly from Dr. Bierenbaum because Dr. Bierenbaum did not want to release child's records to him without being able to meet with him to explain "what the records

meant" and Dr. Bierenbaum "couldn't take time out of his schedule to come to the institution" to meet with him. Father testified that he wanted access to child's medical records because he "wanted to find out what the doctors were saying about [child]." Asked what he would do if he found out child had a medical problem, father replied that he would call great-grandparents "to see if somebody could help [child]." Nothing in the record indicates that father "has any specialized training or education . . . that would provide him with the ability to help [child] by reviewing [child's] medical records." Id. at 688, 547 S.E.2d at 550-51.

Dr. Bierenbaum explained in a letter to father that it was his policy not to "send copies of reports to parents with whom [he had] not met directly because of [his] concern about possible misinterpretation of findings." Dr. Bierenbaum further advised father that father could call him collect to discuss his sessions with child, but father never called, instead responding by letter that he needed Dr. Bierenbaum's phone number, despite the fact that "the phone number . . . was on the letterhead." Dr. Bierenbaum also testified that mother reported to him that father was a "provocative, controlling and abusive man," who "was more concerned about his own needs as a father than about the emotional well-being of . . . child."

Asked why father should not have access to child's medical reports, mother testified that father "twist[ed] the truth" to serve his own purposes and had a warped sense of reality in which he was never at fault. He would use child's medical records against her, she indicated, "to keep . . . the court proceedings going forever," which was "not healthy for [child]." Mother further testified that she had to get a block on her phone because father called her constantly and would call her back constantly if she hung up or did not accept his collect phone calls.

From this evidence, the circuit court judge, as finder of fact, could properly conclude that, had he access to them, father would use child's medical records in a manner inconsistent with child's best interests. See id. at 688, 547 S.E.2d at 551 (noting that the trier of fact ascertains the

- 13 -

witnesses' credibility and "the weight to be given to [their] testimony" and exercises "discretion in accepting or rejecting [their] testimony"). Conversely, no evidence in the record establishes that father's access to child's medical records would benefit child. We hold, therefore, that the evidence in the record supports the circuit court's determination that good cause existed to deny father access to child's medical records.

## IV. CONCLUSION

For these reasons, we affirm the circuit court's rulings prohibiting great-grandparents from taking child to see father in prison and denying father access to child's medical records.

Affirmed.